**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3057-18T3

GRAND MADISON LLC,

     Plaintiff-Appellant,

v.

BERNADETTE ROTONDA,
FRANKLIN SOCIETY FEDERAL
SAVINGS & LOAN ASSOCIATION,
n/k/a HSBC BANK, NA,
MIDLAND FUNDING LLC, and
STATE OF NEW JERSEY,

     Defendants,

and

HUNTINGTON ASSOCIATES, LLC,

     Intervenor-Respondent.

_____

Argued February 26, 2020 – Decided April 13, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. F-003270-18.

Keith Alan Bonchi argued the cause for appellant (Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill, attorneys; Keith Alan Bonchi, of counsel and on the briefs; Elliot J. Almanza, on the briefs).

Michael S. Burns argued the cause for intervenor-respondent (Burns & Isen, LLC, attorneys; Michael S. Burns, on the brief).

PER CURIAM

In this tax lien foreclosure action, plaintiff Grand Madison LLC appeals from the January 16, 2019 Chancery Division order staying the entry of final judgment, permitting intervention and redemption by intervenor Huntington Associates, LLC (Huntington), and denying plaintiff's cross-motion for a constructive trust. Guided by Simon v. Cronecker, 189 N.J. 304 (2007) and FWDSL & Associates, LP v. Berezansky, 452 N.J. Super. 408 (App. Div. 2017), we affirm.

We glean these facts from the record. As a result of the accrual of unpaid real estate taxes, on July 6, 2011, Robert Rothman purchased tax sale certificate no. 11-05417, encumbering property owned by Bernadette Rotonda. For the next seven years, Rothman paid the delinquent taxes and allowed Rotonda to continue to reside on the property. However, on February 14, 2018, Rothman filed a tax foreclosure complaint pursuant to N.J.S.A. 54:5-86 to -87 of the Tax

Sale Law, N.J.S.A. 54:5-1 to -137,[1] which proceeded as an uncontested foreclosure. An Order Setting Time, Place and Amount of Redemption was entered on May 30, 2018, fixing the redemption amount at $104,605.06, and the last day to redeem as July 27, 2018. On August 27, 2018, Rothman assigned the certificate to Grand Madison, an entity he controlled. On the same date, Grand Madison moved to substitute in as plaintiff and for final judgment.

On August 31, 2018, prior to the entry of final judgment, Huntington entered into a "profit-sharing" sales agreement with Rotonda to purchase the property (the agreement). According to the agreement, because the property was "subject to a tax lien foreclosure action" and Rotonda did "not have the funds needed to redeem the tax lien," Huntington agreed "to provide the necessary funds to redeem the tax lien and repair the [p]roperty to increase its resale

---

[1] The Tax Sale Law provides a mechanism for individuals or entities to purchase tax liens from municipalities and initiate foreclosure actions against property owners who are delinquent in paying their property taxes. The foreclosure process begins when a property owner fails to pay the property taxes, as the unpaid balance becomes a municipal lien on the property. N.J.S.A. 54:5-6. "When unpaid taxes . . . remains in arrears on the [eleventh] day of the eleventh month in the fiscal year when the taxes . . . became in arrears, the collector . . . shall enforce the lien by selling the property . . . ." N.J.S.A. 54:5-19. Upon completion of the sale, a certificate of tax sale is issued to the purchaser, N.J.S.A. 54:5-46, conveying the property to the purchaser, "subject to a person with an interest in the property having the right to redeem the certificate, as prescribed by statute." Cronecker, 189 N.J. at 318 (citing N.J.S.A. 54:5-31 to -32, -46).

value." In consideration, Huntington would pay $10,000 to Rotonda as "[i]nitial [c]losing [p]roceeds" upon Rotonda transferring title to the property to Huntington (the initial sale). Then, "[u]pon completion of the [r]epair [w]ork," Huntington would sell the property at "fair market value" (the resale).

Pursuant to the agreement, once the property was resold, Huntington would "receive one hundred percent of the net proceeds obtained in connection with a sales price of . . . up to $225,000 . . . and then [Huntington] and [Rotonda] [would] each receive fifty percent . . . of any excess proceeds" above the $225,000 threshold. Additionally, Huntington agreed to pay $115,000 for the outstanding tax lien certificate, and to satisfy $4000 in personal judgments against Rotonda. Further, an amendment to the agreement executed on September 11, 2018, specified that Rotonda would "be permitted to continue to reside on the property rent-free . . . for sixty . . . days after the [i]nitial [s]ale." However, the entire agreement was contingent upon Huntington succeeding in its motion to intervene in the foreclosure action. Otherwise, the agreement would "be deemed null and void."

Armed with the agreement, on September 12, 2018, Huntington moved to stay entry of final judgment, intervene in the foreclosure action, and redeem the tax sale certificate. In support, Huntington's attorney and member certified that

A-3057-18T3

based on the recent sale of comparable property, the property was "worth no more than $145,000," and "likely significantly less since it [was] in worse condition." However, "a real estate broker" "verbally advised . . . that the renovated [p]roperty will likely sell in the range of $250,000."[2] The attorney averred that the agreement was entered "[a]fter arms-length negotiations" with Rotonda, and the terms "represent[ed] more than 'substantial consideration'" regardless of "the ultimate sales price of the renovated property."

Rotonda supported Huntington's motion and certified she understood she was only "guaranteed $10,000 and . . . may or may not get more depending on what the property sells for." She also understood that "Huntington is a real estate investor and is doing this deal to make money." However, she believed that "Huntington has been upfront and honest," and "put no pressure on [her] whatsoever." She explained that once her live-in "boyfriend of over [twenty-five] years" "became disabled and lost his job," they "were unable to keep up with the taxes or . . . maintain the property." She acknowledged that Huntington was "putting significant time, effort and expense into this deal," and "[w]ithout Huntington's involvement, there [was] no doubt that [she] would have lost the

---

[2] In a later certification, the attorney averred that based on his visual inspection of the property, "a full and complete renovation" would "cost in the range of $50,000 to $75,000."

property through the foreclosure action." She felt "the amount offered by Huntington [was] real and substantial money for the property" and was "a very big benefit to [her]."

Grand Madison opposed Huntington's motion and filed a cross-motion for a constructive trust. In opposing Huntington's motion to intervene, Rothman asserted the "purported profit[-]sharing agreement [was] misleading, deceptive and against public policy." To support his application for a constructive trust to allow him to acquire Huntington's contractual rights under the agreement, Rothman certified he was "prepared to write a check to [Rotonda] for the sum of $20,000[] or double what Huntington [was] offering to her." He would also "allow . . . Rotonda to stay in the property for six months . . . at no cost and the reduced rate of $825[] per month for an additional six months."

"In the alternative," Rothman would "allow [Rotonda] an additional six months" to "list the property with a realtor, sell it, redeem [the tax] lien and keep 100% of the net proceeds," rather than "hav[ing] to pay it over to a predatory title raider such as Huntington." Rothman submitted that if the motion judge was inclined to deny his cross-motion, then he "request[ed] discovery" in order "to develop a full record of what was told to . . . Rotonda in order for her to agree to give almost all of her equity over to [a] title[]raider." In a responding

certification, Rotonda rejected Rothman's offer, stating that although its terms were more favorable than Huntington's, "[she] was aware . . . when [she] signed the agreement" that Rothman "[might] try to make an offer,"[3] despite the fact that Rothman "never contacted [her] over the last [seven] years to offer [her] anything."

On October 12, 2018, the motion judge conducted oral argument on both motions. The judge posited that under Cronecker and its progeny, "the real issue . . . [was] whether or not [Huntington's] offer amounts to more than nominal consideration." According to the judge, to make that determination, he needed to evaluate "the amount received, versus the fair market value, versus the equity in the property[,] and . . . the [windfall] profit to the purchaser." Because he was missing "admissible . . . evidence, under [Rule] 1:6-6, that would support the conclusion[] that th[e] property [was] worth no more than [$145,000]," as claimed by Huntington, the judge gave both parties ten days to "supplement the record."

Thereafter, the parties each submitted appraisal reports for the property from real estate professionals, each using the sales comparison approach.

---

[3] The agreement specified that "[b]y signing," Rotonda "waive[d her] right to accept any other offers, agreements or arrangements related to the sale of the [p]roperty."

Huntington's appraiser determined that the property was valued "as is" at "$145,000." Although Huntington's appraiser subsequently corrected the appraisal to indicate that instead of a single lot, the property actually consisted of "two lots," with "the dwelling . . . located on one" and "a non-buildable side yard" on the other, the appraised value remained unchanged. In contrast, Grand Madison's appraiser established a value of "$210,000." Additionally, Grand Madison submitted the municipal assessment for the property, indicating an assessed value of "$148,100 for the land and $81,300 for the improvements," for a total of "$229,400."

After reviewing the appraisals, on January 16, 2019, the judge granted Huntington's motion. In an oral decision, preliminarily, the judge found Huntington's motion to intervene "timely because it was filed before the entry of the final judgment." Next, while acknowledging Grand Madison's argument that the consideration was "illusory" or merely "contingent," the judge noted that in addition to the $10,000 guaranteed payment, Rotonda was receiving "benefit[s]" under the agreement such as "stay[ing] in the house for [sixty] days" after closing rent free, and "the satisfaction of [her] personal judgments" as well

8

as "[fifty] percent of the profit over [the] $225,000" threshold "after Huntington completes what it describe[d] as significant and costly renovations."[4]

In examining the appraisals, the judge determined that notwithstanding Grand Madison's contention that "Huntington has not provided a competent valuation of the property," he now "ha[d] competent proof" based on the appraisals "submitted from licensed appraisers." The judge reasoned that the $65,000 difference between Huntington's $145,000 appraisal and Grand Madison's $210,000 appraisal was "not a significant amount" when assessing whether the consideration was nominal.

Noting that "appraisals of property . . . are imprecise" and subject to "a lot of variables," the judge elaborated:

> if Huntington's right, you have . . . a property that's worth $145,000 with about $120,000 in liens and judgments. . . . [U]sing that number, . . . it results in . . . there being $25,000 in equity. And if [calculated] . . . on a percentage basis, . . . then . . . Rotonda would be getting [forty] percent of the equity . . . by way of the cash payment. And then obviously additional payment through . . . profit that came from the sale, if there was profit.
>
> . . . .

---

[4] The judge noted "the parties concede[d] . . . the property [was] in poor condition and in need of substantial repair."

> And . . . if Grand Madison's right, then we [have] a $210,000 property with $120,000 in expenses. And so we [have] $90,000 in equity that arguably . . . would belong to . . . Rotonda. And . . . what's she getting out of the deal? She's getting [$]10,000. So what is that? About . . . [eleven] percent of the equity is all she's going to get.

Applying N.J.S.A. 54:5-89.1, Cronecker and Berezansky, the judge concluded the agreement with Huntington was enforceable because "the consideration . . . [was] more than small or trifling" and "provide[d] some meaningful monetary relief to [Rotonda,]" who continuously indicated "she [chose] to sell to [Huntington]" and "not to deal with [Grand Madison]." The judge distinguished the "ratio[s]" present "in Cronecker and some of the other cases" and determined that, "[h]ere, . . . the tolerances [were] much less," "[t]he numbers [were] much closer," "the range [was] not that big," and "[t]he differences [were] not that great between [$145,000] and [$210,000]."

The judge explained that under either appraisal,

> $10,000 is more than nominal in this case. . . . [A]long with, of course, the potential profit and . . . the free rent, . . . this offer is [not] so extremely one-sided in favor of Huntington that it would be, could be, [and] should be deemed unconscionable under the circumstances.
>
> . . . .

A-3057-18T3

> Clearly, there's a benefit to . . . Rotonda. She gets money that she . . . loses if the foreclosure continues. And she loses whatever equity . . . she has in the property, whatever that equity is. Here, . . . she does get a benefit under the circumstances.

The judge ordered Grand Madison "to accept" Huntington's "tender [of] the amount necessary to redeem the tax sale certificate" "through and with the Belleville tax collector," and directed that "upon redemption, . . . the tax lien foreclosure action would be dismissed" and the "[lis] pendens would be discharged." Additionally, the judge denied Grand Madison's application for a "constructive trust" and "discovery" on "Rotonda's motivation," on the ground "that those issues [were] moot." The judge entered a conforming order and this appeal followed.

On appeal, Grand Madison raises the following points for our consideration:

> POINT ONE
>
> THE CONTRACT BETWEEN [ROTONDA] AND HUNTINGTON IS NOT A PERMISSIBLE PROFIT-SHARING AGREEMENT, BUT INSTEAD A PREDATORY ARRANGEMENT THAT CONTRAVENES THE PRINCIPLES OF CRONECKER AND THE PURPOSE OF N.J.S.A. 54:5-89.1.

A.     THIS CASE IS SIGNIFICANTLY DISTINGUISHABLE FROM THE BEREZANSKY DECISION.

B.     THE BEREZANSKY DECISION IS FATALLY FLAWED IN ANOTHER WAY.

POINT TWO

THE TRIAL COURT ERRED IN CONCLUDING THAT THE DISPARITY IN VALUES BETWEEN THE TWO APPRAISALS WAS INSIGNIFICANT [BECAUSE] $10,000 PLUS $4,000 OF DEBT RELIEF IS "NOMINAL CONSIDERATION" FOR A PROPERTY VALUED AT $210,000 WITH $90,000 OF EQUITY.

A.     HUNTINGTON'S APPRAISAL IS DEFECTIVE AND INCREDIBLE.

B.     THE SO-CALLED "PROFIT SHARING" AND [SIXTY] DAYS OF RENT-FREE USE AND OCCUPANCY ARE ILLUSORY AND NOT CONSIDERATION.

As framed by Grand Madison's arguments, our review focuses on whether the proposed purchase price for the property contained in the agreement provided more than nominal consideration. In that regard, we will not disturb the findings and conclusions of the judge if they are supported by substantial, credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). However, "[a] trial court's interpretation of

12

the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"N.J.S.A. 54:5-89.1[5] bars a party from intervening in a tax foreclosure action when claiming a right in the property that was acquired 'for a nominal consideration.'" Berezansky, 452 N.J. Super. at 412 (quoting N.J.S.A. 54:5-

---

[5] N.J.S.A. 54:5-89.1 provides in pertinent part:

> In any action to foreclose the right of redemption in any property sold for unpaid taxes . . . , all persons claiming an interest in or an encumbrance or lien upon such property, by or through any conveyance, mortgage, assignment, lien or any instrument which, by any provision of law, could be recorded, registered, entered or filed in any public office in this State, and which shall not be so recorded, registered, entered or filed at the time of the filing of the complaint in such action shall be bound by the proceedings in the action so far as such property is concerned, in the same manner as if he had been made a party to and appeared in such action, and the judgment therein had been made against him as one of the defendants therein; but such person, upon causing such conveyance, mortgage, assignment, lien, claim or other instrument to be recorded, registered, entered or filed as provided by law, may apply to be made a party to such action. No person, however, shall be admitted as a party to such action, nor shall he have the right to redeem the lands from the tax sale whenever it shall appear that he has acquired such interest in the lands for a nominal consideration after the filing of the complaint . . . ."

13

89.1). In <u>Cronecker</u>, our Supreme Court weighed the equities posed by the respective interests of the property owner, the tax sale certificate holder, and the third-party investor and concluded, "the Legislature intended to extend judicial scrutiny to financial arrangements between third-party investors and property owners [made] during the post-foreclosure complaint period" by enacting N.J.S.A. 54:5-89.1 "to ensure that the third-party investors do not exploit vulnerable owners by offering only nominal consideration for their property interests." 189 N.J. at 328.

In defining "more than nominal consideration" in the context of N.J.S.A. 54:5-89.1, the <u>Cronecker</u> Court

> adopt[ed] a more flexible, under-all-the-circumstances approach that will keep the focus on the benefit to the property owner facing forfeiture of his land. Strict mathematical equations cannot address the varying circumstances that may bear on a fair determination of the issue. The court may consider a number of factors, including but not limited to the amount received by the owner in comparison to the property's fair market value and to his equity in the property. The court also may give some weight to a windfall profit to be made by the third-party. A court should rightly be reluctant to strike-down a third-party financing arrangement that will provide some meaningful monetary relief to the property owner. In the end, more than nominal consideration under N.J.S.A. 54:5-89.1 means consideration that is not insubstantial under all the circumstances; it is an amount, given the nature of the transaction, that is not unconscionable.

A-3057-18T3

[Id. at 334-35.]

In Berezansky, we interpreted the Cronecker Court's definition of "more than nominal consideration" "to require not only a traditional examination of whether the consideration is more than 'small' or 'trifling,' but also an examination of that question from the property owner's standpoint." 452 N.J. Super. at 414 (quoting Cronecker, 189 N.J. at 332) (citation omitted). To that end, in Berezansky, we "compar[ed] the benefits conveyed by the financial arrangement between Bandi [Property Group, the third party investor,] and [Richard and Donna] Berezansky[, the property owners,] and the catastrophic financial impact facing the Berezanskys if their agreement with Bandi [was] not given effect." Ibid.

There, the "plaintiff FWDSL & Associates purchased a tax sale certificate on . . . [the] Berezansky's Manville home," and "filed a foreclosure complaint . . . against the Berezanskys, as well as the State of New Jersey, which possessed a $70,000 judgment against Richard." Id. at 410. "[P]rior to the expiration of the time for redemption," Bandi, "claiming it held title and was a party to a profit-sharing agreement with the Berezanskys—moved to intervene and redeem." Ibid. Under the profit-sharing agreement, Bandi would satisfy all liens and judgments affecting title, consisting of the State's $70,000 judgment

15

as well as $43,000 in tax liens, pay the Berezanskys $10,000, give the Berezansky's a rent-free use and occupancy period in the property, improve the property to maximize resale value, and, once the property was sold and certain expenses deducted, divide the net proceeds thirty-five percent to Bandi and sixty-five percent to the Berezanskys.[6] Id. at 411.

In upholding the agreement, we held

> Bandi's financial obligations are not insubstantial and certainly represent more than nominal consideration. Even though the tax payments, the repairs, and the satisfaction of the $70,000 judgment will be returned to Bandi following the property's sale, their payment prior to the sale constitutes a benefit that exceeds the nominal threshold; indeed, should the property never sell for a profit, the Berezanskys would obtain a considerable benefit from being relieved of the $70,000 judgment. And—not to be ignored—the Berezanskys secured a right to recover sixty-five percent of the net proceeds that would not be available if the Bandi agreement were found ineffectual or unlawful. We are satisfied that the form of the Bandi-Berezansky financial arrangement was not barred by N.J.S.A. 54:5-89.1 as that statute has been interpreted and enforced by our Supreme Court, and that Bandi gave more than nominal consideration in obtaining title and the right to redeem.
>
> [Id. at 415 (footnote omitted).]

---

[6] Although no appraisals were discussed, "Bandi claimed it learned from public records that: the 'equalized assessed value of the [p]roperty [was] $314,792.13.'" Id. at 411 (first alteration in original).

16

Likewise, here, we discern no basis to set aside the judge's finding that the payments Huntington proposed under the agreement provided Rotonda more than nominal consideration. Although the appraised value of the property was disputed, it is but one of "a number of factors" reviewed when analyzing all of the circumstances under Cronecker's "under-all-the-circumstances approach." Id. at 334-35. Further, as we did in Berezansky, we reject Grand Madison's "argument that our jurisprudence calls for a blanket rejection of all profit-sharing agreements in this context." 452 N.J. Super. at 413. Indeed, "[t]here is nothing contained in the Cronecker decision that limits the form such financial assistance must take or that which it may not take." Id. at 412 (citing Cronecker, 189 N.J. at 330-31).

Similarly, as we noted in Berezansky, even if "part[s] of the consideration may appear illusory—the initial $10,000 payment and the use-and-occupancy agreement are certainly real and more than a trifle," and the $10,000 "payment alone," "constitutes more than 'nominal consideration' for entry into the profit-sharing agreement." Id. at 414. We are satisfied that in granting Huntington's motion to intervene and redeem, the judge considered all applicable circumstances in his analysis, and reached a conclusion that is supported by the record and legally sound. Moreover, the judge correctly denied the cross-motion

17

to impose a constructive trust to allow Grand Madison to succeed to Huntington's contractual rights because, as the <u>Cronecker</u> Court noted, as a commercial investor itself,

> Plaintiff[] . . . controlled [its] own fate[].  Before filing the foreclosure complaint[], plaintiff[] could have beat [the third party investor] to the punch and offered to purchase title to the property directly from the owner[].  Instead, plaintiff[], at [its] own peril, chanced that [it] could acquire the property through foreclosure without any further financial commitment.
>
> [<u>Id.</u> at 329-30 (footnote omitted).]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3057-18T3